INTERLAKE IRON CORPORATION (FORMERLY BY-PRODUCTS COKE CORPORATION), PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20495.   Promulgated February 25, 1932.

*Kemper K. Knapp, Esq., J. H. Hershberger, Esq., Andrew T. Smith, Esq.,* and *Lewis H. Barnes, Esq.,* for the petitioner.

*John D. Foley, Esq.,* and *James B. Maddox, Esq.,* for the respondent.

## OPINION.

SEAWELL: The one issue which we are asked to decide in this case is what deduction, if any, is allowable to the petitioner for 1918 on account of the amortization of war facilities, and as to this issue most of the basic facts necessary for such a determination are not in dispute. Briefly, the facts are that after April 6, 1917, the petitioner began the construction of a coke oven plant for the production of articles contributing to the prosecution of the war and there was expended in the construction of such plant $8,089,411.85. Four-fifths of such cost were borne by the petitioner and one-fifth by the Semet-Solvay Company, but the parties are agreed that we should determine the amortization allowable, if any, on account of the entire plant, and proper allocation will be made in the final determination as between the petitioner and the Semet-Solvay Company. Some question was raised by the Commissioner in his brief that only expenditures made by the petitioner prior to the Armistice may be considered in determining the amortizable costs, but in view of the evidence to the effect that such expenditures were merely made, and were reasonably necessary, in the completion of this project, which was started after April 6, 1917, we are unable to agree that these costs should be eliminated. *United States Refractories Corporation et al.*, 9 B. T. A. 671. Besides, it would appear that the greater part of the expenditures made in 1919 and 1920 were on account of work done in 1918. There is also no disagreement that the amortization allowable on account of the entire plant is a proper deduction from gross income for 1918; that is, the amortization period does not extend beyond 1918 and any allowance on account of amortization is properly deductible from gross income for 1918.

The further facts involved and the questions presented may best be shown by considering the contentions of the respective parties. In the first place, it is contended by the Commissioner that no amortization deduction is allowable to the petitioner for the reason that on July 30, 1919, the petitioner (and the other parties interested therein) sold the coke oven plant to the Steel and Tube Company of America under a contract by which the petitioner was either reimbursed or made capable of being reimbursed for all costs expended in the construction of the plant. The consideration named in the contract in question was $3,407,500 cash or such equivalent as might be agreed upon and 77,220 shares of common stock of the purchaser. The contract further provided that such price had been fixed on the assumption that the cost of constructing the said plant was $8,015,000, of which $1,500,000 had already been charged off for amortization of excess cost, thus resulting in a saving in tax of $1,200,000, and making an estimated net cost to the petitioner of $6,815,000. It was further provided that in the event the cost as finally determined should differ from the cost then assumed a proper adjustment should be made either by the surrender of stock on the part of the petitioner, should the actual cost be less than the assumed cost, or the issuance of additional stock by the Steel and Tube Company of America, should the actual cost exceed the assumed cost. The actual cost exceeded the assumed cost by $74,411.85, and it is our understanding that the Steel and Tube Company of America delivered additional stock to the petitioner and the other party interested (Semet-Solvay Company) on account of such additional cost. A further provision in the contract was that, in the event the amortization claimed by the petitioner and considered in the contract to have resulted in a saving to it through a reduction in its Federal income and profits tax should be disallowed in whole or in part, additional stock of the Steel and Tube Company of America should be issued to the petitioner on account of any additional tax which it would be required to pay as a result of such disallowance. The stock adjustment, whether because of a change in the assumed net cost of the plant or because of any additional tax which might result from a disallowance of all or any part of the amortization allowance, was to be figured at the rate of 22.6611 shares for each $1,000 of cost or tax involved, that is, approximately $44 per share. On the basis of that contract, the Commissioner contends that through the payment of cash and stock the petitioner (and the Semet-Solvay Company) recovered original costs to the extent of $6,889,411.85 and protected themselves against liability for any taxes which might result through the disallowance of all or any part of the amortization claimed, thus resulting in a situation where there could be neither

gain nor loss on account of the sale and hence no amortization allowable.

But, assuming for the purpose of this phase of the discussion that there was a recovery of costs to the extent of $6,889,411.85 through the receipt of cash and stock, does the fact that, in the event of the disallowance of all or any part of the amortization claimed, the Steel and Tube Company of America would be required to issue additional stock on a specified basis on account of the additional tax resulting from such disallowance mean that the petitioner is thereby assured a complete recovery of its amortizable costs? In other words, does the aforementioned provision assure the petitioner that it will not suffer through the disallowance of the amortization claimed and that if the Government does not allow it the benefit of a saving in tax through the amortization deduction, any additional tax will be paid by the Steel and Tube Company of America? We think it is clear that the contract does not so provide. It is true that the contract provides that the Steel and Tube Company of America " shall compensate By-Products to the extent of any additional Federal Income Tax which it is obliged to pay as a result of such disallowance," but in the following sentence it provides how such compensation shall be effected, namely, through the issuance of stock to petitioner at approximately $44 per share. Obviously, that is very different from saying that whatever additional tax results from such disallowance will be paid by the Steel and Tube Company of America. The purchaser does not agree to pay the tax, but only to issue to petitioner stock on a certain basis in the event petitioner is required to pay additional tax on that account. At most, such provision contains only the possibility of reimbursement. If the stock should be worth the agreed basis when petitioner is required to pay the additional tax there would be an exact reimbursement. On the other hand, if the stock should be worth less at such time of payment the petitioner would not be fully compensated, but, if the stock should be worth more, the petitioner would gain through the disallowance.

On the other hand, we are likewise unwilling to accept the contention of the petitioner that the sale on June 30, 1919, may be disregarded. The petitioner says that when it prepared its return for 1918 it had the undisputed right to a deduction for amortization and that this right could not be destroyed by a subsequent contract. But we think this suggestion overlooks the fact that the amount of amortization is not finally determinative alone upon the basis of a comparison of original costs made after April 6, 1917, and values as they existed at the end of 1918, but, on the contrary, conditions and circumstances arising prior to March 3, 1924, must be taken into

consideration. (Section 234 (a) (8) of the Revenue Act of 1921 and *Manville Jenckes Co.*, 4 B. T. A. 765.) The necessity for considering subsequent events arising during the post-war period is well illustrated in the foregoing cited case where a question of value in use was involved and the amortization allowable was determined upon the basis of the value in use or employment of the taxpayer's facilities in its post-war business. In other words, original or war costs would be compared with value in use during the post-war period. While a sale after the end of the amortization period and prior to March 3, 1924, is somewhat different from post-war value in use, we think it is likewise something of evidentiary value which must be considered in fixing the amortization allowable. For example, if in the case at bar the petitioner had sold its plant on July 30, 1919, for cash in the amount of $8,089,411.85, the original cost, we do not think it would be seriously contended that the petitioner is entitled to any amortization, since through the sale it had recovered its entire war-time investment and hence there was no unbalanced investment, no war-time burden, from which relief need be sought. And, further, it would be most convincing evidence that at July 30, 1919, the war facilities were worth the amount incurred in their construction and acquisition and therefore no occasion for the application of the amortization provision could then be shown. The purpose of the statute is to relieve taxpayers of unbalanced investments incurred during the war and beyond their peace-time needs (*John Polachek*, 8 B. T. A. 1), but where it is shown that the value at the time a taxpayer disposes of a given war facility prior to March 3, 1924, is equal to its war-time cost, no need for the application of the amortization provision exists. It is generally recognized that "value is the price at which a willing seller and a willing buyer would agree to trade if they both were aware of the facts" (*James Couzens*, 11 B. T. A. 1040), and where we have a trade on such a basis there is no occasion to resort to expert testimony or retrospective appraisals in order to determine value on the date when the sale took place. In other words, the selling price becomes the recognized value on the date when the sale took place, and a consideration of the value which the parties thus fixed for the property in question will show whether there was an unbalanced investment after the close of the war and when the property was disposed of from which relief need be sought.

When we come to examine the contract, the conclusion seems inescapable that the parties were trading on the basis of a value then attaching to the assets equal to their cost. In any event, it is evident that the petitioner was seeking to recover through the sale or otherwise (through an amortization allowance) its entire amortizable costs and we think it is likewise evident that there was an indicated willingness on the part of the purchaser to pay, if necessary, an

amount equal to petitioner's original cost in order to acquire the property. Specifically, what the contract provided was that the Steel and Tube Company of America would pay to petitioner $3,407,-500 in cash and would issue to it stock figured at approximately $44 per share in the amount of the difference between the foregoing amount of cash paid and the net cost to petitioner of the facilities after such cost had been decreased by a reduction in tax of $1,200,000 on account of amortization claimed of $1,500,000. It was further agreed that, in the event the amount claimed for amortization should be disallowed in whole or in part, the Steel and Tube Company of America would compensate petitioner to the extent of additional tax resulting from such disallowance by issuing to it stock on the same basis as theretofore issued. The total cost of the amortizable facilities was $8,089,411.85, and we think the answer to our problem follows from a comparison of that cost with the total foregoing recited considerations. First, there was cash in the amount of $3,407,500 and, second, there was stock issued to petitioner at approximately $44 per share, which when added to the cash received makes a total of $6,889,411.85. The petitioner objects to the addition of the stock at that price for the reason that it says the stock did not have a fair market value of that amount or of any other amount. The evidence to support this contention was largely to the effect that the stock was closely held, was not dealt in at or about that time (aside from the transactions here involved), was not listed on a stock exchange and was of a speculative character. We think, however, that this contention overlooks the fact that the parties themselves placed a value on the stock which can not be ignored. A merger or consolidation was taking place in which various interests were being brought together in one concern to be known as the Steel and Tube Company of America. Adverse interests were involved and we think it reasonable to consider that the value fixed for the stock gave due regard to the assets for which the stock was being issued. Particularly do we think such an interpretation should be placed on the price fixed when we have no evidence as to the manner in which the stated price was figured other than shown from the contract and no evidence as to the negotiations leading to the execution of the contract. Clearly, with this contract before us, we are not justified in reaching a different conclusion as to the value fixed for the stock and presumably for the assets back of the stock merely because expert witnesses now say that the assets for which the stock was issued did not have the value which the parties thus appear to have placed thereon at the time the transaction was consummated.

But the foregoing amount of $6,889,411.85 was not all that the Steel and Tube Company of America agreed to pay in order to

acquire the assets and therefore it would not be proper to determine an amortization allowance as the difference between such amount as representing the value of the property when disposed of and the original cost. What was further agreed was that in the event all or any of the amortization originally claimed should be disallowed, the Steel and Tube Company of America would issue to petitioner additional stock at approximately $44 per share in order to compensate petitioner for the additional tax resulting from such disallowance. In considering this feature it should be noted at the outset that the difference between the aforementioned amount of $6,889,411.85 (cash paid and stock issued for the assets) and the original cost of $8,089,411.85 is $1,200,000, the saving in tax referred to in the contract, and not $1,500,000, the amount of amortization referred to as having been claimed. Accepting $6,889,411.85 as the amount received in cash and stock upon the execution of the contract, it would follow that at least $300,000 in amortization would be disallowed, since the part of the war-time investment which was not recovered through the sale was $1,200,000 and not $1,500,000, the amortization claimed. But with the disallowance there would be additional tax to the petitioner and additional cost to the Steel and Tube Company of America, which in turn would reduce the amortization, and by carrying this process to its conclusion all amortization would be disallowed and the Steel and Tube Company of America would be required to issue stock to petitioner at approximately $44 per share in the amount of $1,200,000. It may well be, as we have heretofore indicated, that a different value might attach to the stock when the petitioner is required to pay the additional tax from what it was when the contract was executed, so that the amount received by the petitioner and paid by the Steel and Tube Company of America would be more or less in value than $1,200,000, but we do not regard that as material. Suffice it to say that as far as we know it may not be more or less and, in any event, what we are seeking to determine is not a value based on conditions now or later existing, but rather the value existing when the petitioner disposed of the property in question. And when looked at in this manner, the amount of the obligation then assumed, in terms of the value of the stock then fixed, was $1,200,000, which, when added to the amount of $6,889,411.85, makes $8,089,411.85, the original cost of the assets.

In view of the foregoing, we do not see how it can be said that at the time the petitioner disposed of the war facilities in question there were excess war costs from which relief need be given. What happened later and what results would follow therefrom on account of subsequent events are not matters with which we are concerned in this proceeding. What we have here is a contract apparently entered into at arm's length between a willing seller and a willing

purchaser in which the seller was evidently seeking to have returned to it its investment in certain war facilities and the buyer expressly indicated a willingness to pay that amount, if necessary, in order to acquire the facilities. Whether the purchaser would have paid $8,089,411.85 instead of $6,889,411.85 coupled with the obligation to pay $1,200,000 more if so required, we do not know. If the former course had been pursued there would be no occasion to say that there had been any shrinkage in value of the assets from the time they were constructed by the petitioner for war purposes until they were disposed of after the end of the war, and we think the same conclusion must follow when the latter course was taken. Certainly no better evidence could be found of the value of the assets than that placed thereon by the parties themselves, and, as we view their actions as expressly set out in the contract, we are brought to the conclusion of the recognition by them of a post-war value at the date of disposition equivalent to the war cost. Nor do we regard this as a strained construction of the contract, but rather the only construction which can be placed thereon. Whether they were fully cognizant of all the consequences which would flow from such a contract we do not know, but each party is presumed to know the law and we can not do other than apply the statute to what occurred rather than attempt to reach a more advantageous conclusion to the petitioner on the basis of a course of action which was neither undertaken nor carried out. When we view all of the foregoing considerations, no occasion for the granting of the relief sought can be found and accordingly the action of the Commissioner in denying all amortization claimed is sustained.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

Van Fossan, Arundell, and Trammell dissent.